# Exhibit 40

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 20MT

May 24, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

|  |  |
|---|---|
| 1                          Friday, 24 May 2024 | 1   probably would have been doing this anyway, but I think |
| 2   (9.30 am) | 2   it is important in the context of his very long |
| 3                    Housekeeping | 3   cross-examination that you are as clear as you can be |
| 4   MR JUSTICE ANDREW BAKER: Good morning, Mr Jones. | 4   before you ask any questions: the topic we are going to |
| 5   MR JONES: Good morning. My Lord, one very small point | 5   deal with now is X, there will be some questions on |
| 6       I wish to raise and I'm not going to say anything that | 6   that, and when you finish those questions and there is |
| 7       Mr Shah shouldn't hear and I'm speaking with | 7   then another topic, just introduce that, because clearly |
| 8       Mr Goldsmith's agreement. | 8   for him he is in a sense in the middle of a process of |
| 9           My Lord, we had between us a disagreement yesterday, | 9   reliving these events and going through them in an order |
| 10      as you recall, as to what each of us had said to the | 10  and we are asking him to switch into: now let's think |
| 11      other in relation to today's evidence. | 11  about whatever episode or aspect of the case it is that |
| 12  MR JUSTICE ANDREW BAKER: Yes. | 12  might even be jumping around a bit chronologically. Is |
| 13  MR JONES: I found myself in the early hours of this morning | 13  that all right? |
| 14      wide awake reliving those conversations and I'm now | 14  MR GOLDSMITH: Absolutely, my Lord. |
| 15      quite confident that he is right and that I was wrong | 15  MR JUSTICE ANDREW BAKER: Good morning, Mr Shah. |
| 16      and what I had done in the fog of war in the afternoon | 16  A. Good morning, my Lord. |
| 17      was to cross-wire the consequence of those discussions | 17  MR JUSTICE ANDREW BAKER: I hope you understood that. As |
| 18      and what I had reported to my client with the express | 18      you know, we are handing over to Mr Goldsmith for |
| 19      words that he and I had exchanged, so I have approached | 19      cross-examination questions of you on behalf of SKAT |
| 20      him this morning, corrected the relationship between him | 20      today. He is dealing essentially, as I understand it, |
| 21      and I, he wasn't I think unduly concerned by it, but it | 21      with a series of different and discrete topics and he |
| 22      is right that I correct it, and it is right that your | 22      will do his best to make clear at the start of each |
| 23      Lordship is told. | 23      topic he is going to deal with what it is in general |
| 24  MR JUSTICE ANDREW BAKER: Very good Mr Jones. While you are | 24      terms he is turning to, so that you can have your mind |
| 25      on your feet, not relating to that, but —— not relating | 25      turned to that part of the case rather than the general |
|                              1 |                              3 |
| 1   to that specific point but relating to those same | 1   chronological flow of events that Mr Rabinowitz was |
| 2   conversations, have I understood correctly that whatever | 2   taking through, all right? |
| 3   else they did or did not do, they identified between you | 3   A. That is clear, thank you. |
| 4   as legal teams what are the discrete topics Mr Goldsmith | 4              MR SANJAY SHAH (continued) |
| 5   is going to cross-examine? | 5           Cross-examination by MR GOLDSMITH |
| 6   MR JONES: No, we left that entirely to Mr Rabinowitz and | 6   MR GOLDSMITH: Good morning, Mr Shah. |
| 7       Mr Goldsmith, because they could have done one of two | 7   A. Good morning. |
| 8       things. He could have picked up the chronology as it | 8   Q. I am going to ask you first some questions about the |
| 9       stood at the time or taken a discrete topic. We had no | 9       Belgian and Austrian trading by GSS clients, if that is |
| 10      reason to interfere with that, so we haven't discussed | 10      all right. |
| 11      it. | 11  A. Yes. |
| 12  MR JUSTICE ANDREW BAKER: Mr Goldsmith, as I have understood | 12  Q. So you have already touched on the fact with |
| 13      it from what Mr Rabinowitz therefore said to me, the | 13      Mr Rabinowitz that the GSS trading occurred in respect |
| 14      intention —— and I think that is the reason I put it | 14      of German and Austrian shares, correct? |
| 15      that way to Mr Shah —— was that you were somewhat | 15  A. Yes, that's correct. |
| 16      interrupting the more general chronological narrative | 16  Q. And you have told Mr Rabinowitz that the GSS trading in |
| 17      flow of Mr Rabinowitz's cross-examination and taking | 17      respect of Belgian and Austrian shares was structured on |
| 18      discrete topics; is that correct? | 18      a cum-ex basis; that's right, isn't it? |
| 19  MR GOLDSMITH: That is correct. | 19  A. Yes, that's correct. |
| 20  MR JUSTICE ANDREW BAKER: If in the light of Mr Jones' | 20  Q. And you have discussed with Mr Rabinowitz how in the |
| 21      indication —— and that is fine —— that is how the | 21      context of the Danish trading under the GSS Trading |
| 22      parties have approached it, the particular topics you | 22      Model, equal and opposite trades were entered into and |
| 23      are turning to have not been shared and therefore by | 23      then internally settled to zero. I don't intend to go |
| 24      definition they can't have been notified to Mr Shah, | 24      over that again so far as the Danish shares are |
| 25      I think I will say in fairness to Mr Shah, again you | 25      concerned, but can I just ask this: the Belgian GSS |
|                              2 |                              4 |

```
 1   MR JUSTICE ANDREW BAKER:  A cash collateral amount that will
 2       match an equity purchase, yes.
 3   MR GOLDSMITH:  Exactly yes, and we can see the cash
 4        collateral  amount here is 228,896,500, yes.
 5   A.  Yes, I see that.
 6   Q.  And the price is 45.7793 per share, yes?
 7   A.  Yes, I see that.
 8   Q.  And the cash rebate interest and cash rebate spread
 9       figures, that's the interest on the cash collateral that
10       the stock lender has to pay, yes?
11   A.  Yes, I see that.
12   Q.  And here the interest rate is overnight DKK LIBOR plus
13       70 basis points.  That is -- so in other words it is DKK
14       LIBOR plus 0.7%, yes?
15   A.  Yes, I see that.
16   Q.  Can we then look at {MTKC6/729.1/1}.  This, Mr Shah, is
17       another stock loan confirmation from March 2013 with AOI
18       as lender and Amalthea as borrower, and again, the way
19       that my Lord described, this will be related to
20       an equity trade, a short sale trade that will have
21       happened a few days earlier, yes?
22   A.  Okay, yes.  So this is unrelated to the one that we just
23       saw.
24   Q.  Yes.  And here the notional -- the quantity of shares is
25       3 million and the notional cash collateral is almost

                                 109

 1       3 billion Danish krone.  That is a huge sum, isn't it?
 2   A.  Probably not in real money, but yes, I agree that is
 3       a big amount.
 4   Q.  What do you mean not in real money?
 5   A.  That was my idea of a joke.  But yes, that is a big
 6       amount of money.
 7   MR JUSTICE ANDREW BAKER:  I think telling leading counsel on
 8       behalf of the Danish nation that Danish krone is not
 9       a real currency was an attempt at humour.
10   MR GOLDSMITH:  Yes, right, fair enough.
11   MR JUSTICE ANDREW BAKER:  I understand where you might have
12       gone with it, Mr Goldsmith, but on this occasion,
13       I think let's just take that as humour.
14   MR GOLDSMITH:  If I told you that Amalthea had been formed
15       in the Cayman Islands with limited capitalisation only
16       a month or so before this, it is pretty extraordinary
17       for it to be committing to provide to buy shares worth
18       nearly 3 billion Danish krone, no?
19   A.  My view is that the number of days between a company's
20       incorporation and the day it starts trading is not
21       relevant.  I also think the share capital amount is not
22       relevant.  What I understand from this trade, and
23       probably all the trades in GSS, is that they were
24       guaranteed by Solo, so if Solo has guaranteed it, then
25       that's why those numbers are there.  So that -- for me,

                                 110

 1       the answer to your question is it is not surprising.
 2   Q.  So Solo is guaranteeing them for 3 billion Danish krone.
 3       I can't do the maths off the top of my head, maybe
 4       Ms Nanchahal will help me, but that's going to be
 5       hundreds of millions of pounds, is it not?  For
 6       example --
 7   A.  In the region of £300 million.
 8   Q.  And Solo Capital Partners does not have £300 million,
 9       does it, at this time?
10   A.  Well, I think if we go back to the Solo Model we will
11       see that there are matching incoming and outgoing cash
12       amounts and that is why Solo would have been able to
13       guarantee a trade such as this.
14   Q.  But in a sense that is why it makes it so important that
15       at the end of the day -- from Solo's perspective, at the
16       end of the day things do balance perfectly to zero,
17       because otherwise Solo is at risk on the guarantee, yes?
18   A.  Yes.  I absolutely agree.
19   Q.  Can we see here that the interest on the cash collateral
20       is overnight DKK LIBOR plus 70; that is 0.7 again, yes?
21   A.  Yes, that's correct.  So it is 70 basis points, which is
22       0.7%, yes.
23   Q.  Thank you.  Great.  Can we now -- we might need to come
24       back to those, so don't remove them altogether, but can
25       we go, please, to {MTKC1/607/1}.  And this is

                                 111

 1       a spreadsheet, if Ms Nanchahal could control it, please.
 2       Can we start with the "Statement" tab at the top.  This
 3       is Solo's open position statement for AOI dated
 4       30 September 2013; do you see?
 5   A.  Yes, I see that.
 6   Q.  Again, just to ground this, this was also a spreadsheet
 7       that Mr Rabinowitz went through in opening, just so you
 8       know.  If we go to the stock loan -- sorry.
 9   A.  Sorry to interrupt.  Are we moving away from TDC,
10       because I will not be able to keep all these figures in
11       my head?
12   Q.  Don't worry, I will be reminding you.  The reason I have
13       shown you three sets of trades is because actually their
14       accounting is ultimately related, but I will remind you
15       of the terms as we go through.
16   A.  Okay.
17   Q.  So if we start with -- if we start at row 287, you can
18       see -- there we go, thank you so much -- TDC and in row
19       289 it has 13 March 2013 and I can remind you that the
20       settlement date for the TDC March stock loan was
21       13 September 2013 and in F289 it says, "Cash original",
22       and that was the amount of cash collateral under this
23       loan, just to remind you of those figures.
24           Do you see in G289 we have a rate of 0.63%.  Do you
25       see that?

                                 112
```