# Exhibit 47, Part 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
CUSTOMS AND TAX ADMINISTRATION
OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND
SCHEME LITIGATION

No. 18-MD-2865-LAK

# EXPERT REPORT OF BRUCE G. DUBINSKY MST, CPA, CFE, CVA, CFF, CAMS, MAFF

## December 31, 2021*

*Updated on February 1, 2021.  See attached cover letter.

## TABLE OF CONTENTS

I.    THE ASSIGNMENT ................................................................................................................ 5

II.   EXPERT BACKGROUND AND QUALIFICATIONS ........................................................ 5

III.  SUMMARY OF ASSIGNMENT, SCOPE AND METHODOLOGY ................................. 7

   A.   Documents and Materials Reviewed ................................................................................... 7

IV.   SUMMARY OF OPINIONS ................................................................................................... 9

V.    FACTUAL BACKGROUND ................................................................................................ 11

   A.   Overview of the pension plan groups, plan participants, and associated LLCs ........................... 11

      1.   Argre Plans .................................................................................................................. 12

      2.   Kaye Scholer Plans ..................................................................................................... 12

      3.   Lehman Plans .............................................................................................................. 14

      4.   The Zeta Plans ............................................................................................................. 15

   B.   Overview of "Bellwether" Plans ....................................................................................... 15

      1.   Bellwether Plan 1: Bernina Pension Plan ................................................................... 16

      2.   Bellwether Plan 1a: RJM Capital Pension Plan .......................................................... 17

      3.   Bellwether Plan 1b: Delvian LLC Solo 401(K) Plan .................................................. 17

      4.   Bellwether Plan 2: Basalt Ventures LLC Roth 401(K) Plan ....................................... 18

      5.   Bellwether Plan 2a: STOR Capital Consulting LLC 401(K) Plan ............................... 19

      6.   Bellwether Plan 2b: Edgepoint Capital LLC Roth 401(K) Plan .................................. 19

      7.   Bellwether Plan 3: Loggerhead Services LLC Roth 401(K) Plan ............................... 19

      8.   Bellwether Plan 3a: Roadcraft Technologies LLC Roth 401(K) Plan ......................... 20

      9.   Bellwether Plan 3b: The Bareroot Capital Investments LLC 401(K) Plan .................. 21

      10.  Bellwether Plan 4: FWC Capital LLC Pension Plan ................................................... 22

      11.  Bellwether Plan 4a:  The LBR Capital Pension Plan .................................................. 22

      12.  Bellwether Plan 4b: The Costello Advisors Pension Plan .......................................... 23

      13.  Bellwether Plan 5: The Proper Pacific LLC 401(K) Plan .......................................... 23

      14.  Bellwether Plan 5a:  The SVP 401(K) Plan ............................................................... 24

      15.  Bellwether Plan 5b: The Oaks Group Pension Plan ................................................... 24

   C.   Overview of Solo Capital, related entities, and the people behind the entities .............................. 25

      1.   Solo Capital Partners LLP ........................................................................................... 25

      2.   Solo Capital Limited .................................................................................................... 26

3.    West Point Derivatives Limited ................................................................... 27

4.    Old Park Lane Capital PLC ........................................................................ 28

5.    Telesto Markets LLP.................................................................................. 29

6.    The Solo Group......................................................................................... 30

7.    Ganymede Cayman Limited ....................................................................... 30

8.    The Counterparties To The Solo Trades .................................................... 31

D.    Glossary of key terms and dates ..................................................................... 35

E.    Dividend Withholding Taxes in Denmark ......................................................... 36

F.    Background and discussion on legitimate stock lending transactions ............... 37

G.    Background on the use of legitimate forward/future transactions as a hedge .... 38

VI.    OPINION NO. 1: THERE IS NO EVIDENCE THAT THE PLANS EVER OWNED ACTUAL
SHARES OF DANISH SECURITIES FROM THEIR SOLO TRADES, OR RECEIVED ACTUAL
DIVIDENDS ISSUED BY THE DANISH COMPANIES WHOSE STOCK WAS PURPORTEDLY
USED IN THE SOLO TRADES ........................................................................................ 39

A.    The sub-custodians identified by Solo Capital confirmed that they did not hold any shares of
Danish securities on behalf of the Solo Custodians during the relevant period..................... 40

B.    No evidence of legitimate trading was found in Solo Capital's business records ......... 41

C.    The Solo Trades were pre-arranged, inter-dependent, circular, paper transactions in which no
actual securities were bought or sold ......................................................................... 43

1.    Analysis of the Solo Trades purportedly executed by the Plans ....................... 44

2.    Sample "Simple loop" transaction purportedly executed by the Bernina Plan........................ 46

3.    Sample "Complex loop" transaction purportedly executed by the Loggerhead Plan ................ 58

D.    The Solo Trades in the 15 Bellwether cases all follow a similar trading pattern as compared to the
sample simple loop transaction purportedly executed by the Bernina Plan and the sample complex loop
transaction purportedly executed by the Loggerhead Plan (as discussed in detail above)..................... 74

1.    Example #1: The purported purchase of DKK 659.3 million worth of stock in A.P. Moller
Maersk A/S – B in March 2015 ........................................................................... 75

2.    Example #2: The purported stock loan of DKK 630.8 million worth of shares in A.P. Moller
Maersk A/S – A in April 2015 ............................................................................. 76

E.    Solo Capital pre-arranged the entire structure of the transactions to the Plans and the Plans had no
ability to negotiate the financial terms of the arrangement.................................................... 78

F.    The Plans did not have sufficient capital, liquidity or access to real credit to complete the
purported Solo Trades but for the circular nature of the structured scheme ........................... 83

G.    The Trading Pattern At North Channel Bank Is Consistent With The Solo Trades ..................... 84

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 4

VII.  OPINION NO. 2:  THE SOLO TRADES GENERATED MILLIONS IN WITHHOLDING TAX REFUNDS, BUT THE PLANS WERE LEFT WITH ONLY A FRACTIONALLY SMALL AMOUNT OF THE TOTAL REFUNDS PAID BY SKAT ................................................................. 85

   A.   Ganymede/Solo ................................................................................................. 86

   B.   Recruiters ......................................................................................................... 87

       1.   Markowitz/van Merkensteijn/Klugman ............................................. 88

       2.   Roadcraft Payment Flows .................................................................. 89

       3.   Lehman, Bradley, Tucci, and Crescenzo ........................................... 92

       4.   Roger Lehman ..................................................................................... 92

       5.   Matthew Tucci .................................................................................... 93

       6.   Doston Bradley ................................................................................... 94

       7.   Gavin Crescenzo ................................................................................ 95

   C.   Other Individuals and their Plans ..................................................................... 95

VIII. Conclusion ............................................................................................................. 98

## I.     THE ASSIGNMENT

1.  In April 2021, I was retained by the law firm of Hughes Hubbard & Reed LLP ("Hughes
    Hubbard" or "Counsel"), counsel for Skatteforvaltningen ("SKAT"), to provide forensic
    accounting analyses and render certain expert opinions and conclusions related to an
    international dividend withholding tax refund scheme (the "Assignment").  In this report, I
    render opinions related to:

    - Examining and explaining the various steps of certain purported Danish securities
      transactions that were designed, managed, and purportedly executed by Solo
      Capital or affiliated entities ("Solo" or "Solo Capital") on behalf of approximately
      173 United States pension plans (collectively the "Plans")[1] from 2012-2015 in
      connection with the Plans' applications for dividend withholding tax refund
      claims to SKAT (the "Solo Trades"); [2]

    - Whether the Plans purchased actual shares of Danish securities as part of the Solo
      Trades;

    - Whether the Plans received actual dividends as a result of the Solo Trades; and

    - Who received the proceeds from the refund claim payments made by SKAT.


## II.     EXPERT BACKGROUND AND QUALIFICATIONS

2.  I am the Managing Member of Dubinsky Consulting, LLC ("Dubco"), a consultancy practice
    that places special emphasis on providing forensic accounting and dispute analysis services
    to law firms litigating commercial cases, as well as corporations, governmental agencies, and
    law enforcement bodies in a variety of situations.

3.  I earned a Bachelor of Science Degree in Accounting from the University of Maryland,
    College Park, MD and a Master's in Taxation ("MST") from Georgetown University,

---

[1] I understand that there are an additional 16 plans that are not at issue in this litigation.

[2] I refer to the transactions as "purported" because, throughout my review and analyses of the documents provided in
this matter, I have found no evidence that Solo Capital, its affiliated entities, or the Plans actually traded any real
shares of the underlying Danish stock, nor have I seen evidence that any cash moved from one entity to another for
payment of purchase or sale of the shares or stock loans.  Lastly, I have not seen any proof that any shares that were
purportedly part of the transactions were ever held by any custodians on behalf of Solo Capital and the Plans.  *See*
discussion *infra* for a detailed analysis on these points.

Washington, D.C. I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFE"), Certified Valuation Analyst ("CVA"), Certified in Financial Forensics ("CFF"), Master Analyst in Financial Forensics ("MAFF"), and a Certified Anti-Money Laundering Specialist ("CAMS"), all in good standing, and was formerly licensed as a Registered Investment Advisor Representative.

4.   I have been qualified and testified in over 75 cases in various federal and state courts, as well as other legal tribunals, as an expert witness in the areas of forensic accounting and fraud investigations; bankruptcy; solvency; economic damages; business valuations; investment theory; federal and state income taxation; abusive tax shelters; accounting ethics and standards; Securities and Exchange Commission related matters; accounting malpractice; investment advisory issues; Generally Accepted Accounting Practices, and a variety of other accounting, financial and tax matters. Additionally, I have professional experience in computer forensics and related computer investigations.

5.   I have worked on some of the largest fraud cases in the world including:

- Bernie Madoff Ponzi;
- Parmalat milk company fraud;
- Enron fraud;
- Wyly brothers' offshore tax fraud;
- Robert F. Smith offshore tax fraud (the largest criminal tax fraud case in United States history); and
- Dozens of other cases that involved offshore tax motivated transactions that were all found to be shams.

6.   A current and accurate copy of my curriculum vitae and listing of trial and deposition testimonies are attached hereto as Appendix A.

7.   My opinions and conclusions expressed herein are based upon information available to me and my understanding of the facts in this case, as well as information gained during the course of my performance of this Assignment. Further, I have relied upon my education, training and more than 38 years of professional experience in rendering my opinions and conclusions, and my opinions and conclusions herein are stated to a reasonable degree of

accounting certainty.[3]

8. Litigation and forensic service engagements performed by CPAs are deemed to be consulting services as defined by the American Institute of Certified Public Accountants ("AICPA"). As such, my work on this Assignment was performed in accordance with the applicable general standards as set forth in the Standards for Consulting Services established by the AICPA, as well as the specific standards enumerated in the AICPA Statement on Standards for Forensic Services No. 1. Further, as a result of having other relevant professional certifications, as more fully described herein, I adhered to the applicable standards of those governing organizations in the performance of my work in this matter and the rendering of these opinions.

9. This Report is based upon the information available to me and reviewed to date. I reserve the right to supplement or amend this Report as necessary to respond to any additional information that becomes available for my review including, but not limited to, issues raised by experts that may be retained by the defendants in this matter.

10. In addition, I reserve the right to prepare additional exhibits, charts, graphs, tables, demonstratives, and diagrams to summarize or support the opinions and analyses set forth in this Report and utilize them during any testimony should this matter require so.

11. Dubco is being compensated at hourly rates based on the level of personnel involved in the Assignment. My hourly billing rate charged by Dubco is $1,050. Dubco's fees for this engagement are not contingent on the conclusions reached or ultimate resolution of the case. I have no direct or indirect financial interest in the outcome of this case or in any of the parties in this matter.

## III.    SUMMARY OF ASSIGNMENT, SCOPE AND METHODOLOGY

### A.    Documents and Materials Reviewed

12. In the course of my analysis, I requested and was provided access to information including,

---

[3] I have defined a "reasonable degree of accounting certainty" to mean that level of certainty that would likely be attained by a group of my professional peers, with the same or similar education, training, and experience, given access to the same information, in reaching the same or similar conclusions.

but not limited to:

- All documents produced by the defendants and U.S.-based third parties in this action;[4]

- A database of documents of Solo Capital and related entities obtained under court order from a related litigation in Dubai;[5]

- Documents produced by various foreign entities in response to letters of requests filed in this action under the Hague Convention on Taking Evidence Abroad.

- Documents produced in this action from SKAT's files;

- Bank statements for Solo Capital and related entities; and

- Various deposition transcripts for persons deposed in this matter and the exhibits to those depositions.

13. In addition to the information to which I was provided access, I obtained information where necessary to my work herein from publicly available sources. I also consulted applicable professional treatises, sources and publications regarding professional standards, methodologies, and related requirements when necessary.

14. Under my direct supervision, the work conducted by associates and any others in connection with the Assignment was planned, supervised, and staffed in accordance with applicable professional standards by which I am bound.

15. I conducted a detailed inspection and review of voluminous documents from a variety of sources including emails, brokerage statements, bank records, trade confirmations, corporate documents, regulatory filings, dividend tax reclaim submissions, deposition transcripts and exhibits, and publicly available documents. A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached

---

[4] I was provided access to multiple Relativity databases containing documents produced in this litigation. I had the ability to review the documents and electronic data stored in the database and run queries as I deemed necessary to conduct my work in this case.

[5] I have been informed by counsel for SKAT that a small percentage of documents in this database are being withheld from all parties in the U.S. litigation as privileged, and that another small percentage is not available yet because they are undergoing a privilege review. Further, I have been informed that a hard drive potentially containing Solo Capital and/or related entities documents has been found but is encrypted and cannot be accessed. I do not believe that these facts impact the conclusions of this report and reserve the right to supplement this report if/when more documents become available.

hereto as Appendix B.[6]

## IV.    SUMMARY OF OPINIONS

16. Based on my training, education and professional work experience, and the results of my investigation and analysis in this case (as more fully described in detail throughout this report), I have concluded that:

- There is no evidence that the Plans ever owned actual shares of Danish companies resulting from the purported Solo Trades, or received actual dividends issued by the Danish companies whose shares were allegedly purchased by the Plans.

- The Solo Trades were pre-arranged, closed loop, circular transactions in which a short-seller purported to sell Danish shares to the Plans, but only obtained the non-existent shares by purportedly ultimately borrowing those same shares from the Plans that also did not have any shares.  In effect, in all of the 2,559 Solo Trades, a seller "sold" shares it did not have to a Plan and purported to cover that "sale" by supposedly borrowing those same shares from the Plan, which never had the shares to begin with.

- The Plans did not have sufficient capital, liquidity, or creditworthiness to execute purchases of actual shares in the amounts and volumes of the Solo Trades.

- The overwhelming majority of the "profits" received by the Plans were derived from receiving a small fraction of the dividend tax refund claim paid by SKAT, with de minimis (if any) profits from anything but the refunds.  Most of the proceeds from the tax reclaim payments went to Solo Capital or affiliated entities. Most of the remaining portion of the proceeds from the tax reclaim payments went to individuals or entities controlled by those individuals (the "Recruiters") who recruited people to establish additional pension plans for purposes of submitting more reclaim applications.

17. The essence of the Solo Trades is that all these purported transactions involved the circular

---

[6] Access to documentation was not limited in any manner, and I was allowed to search for information and documentation that both supported the opinions contained herein, as well as countervailing evidence, if any.

transfer of non-existent Danish shares between the "seller" and the Plans. There is no evidence that the seller ever possessed the shares it purported to sell to the Plans. In every case, the seller borrowed the shares from the Plan—the very same shares that the seller purportedly sold to the plan in the first place. Below is a simplified graphical representation of the Solo Trades, which illustrates the circular nature of the transactions.[7]



**Figure 1 – Solo Trade Diagram**

18. In fact, by removing the intermediaries, which were simply steps inserted to obfuscate the true nature of the round-trip transaction, the whole transaction can be boiled down to its foundation, as shown in the Figure below, which is the purported transfer of non-existent shares directly between the "seller" and the Plan.

---

[7] The Solo Trades, as described in greater detail later in this Report, are comprised of both a simple and complex loop. In both instances, for purposes of focusing the reader on the critical aspects of the transactions, I have purposely omitted a detailed discussion on the use of forward contracts and futures contracts that were present in the two different structures (*i.e.,* the simple and complex respectively). I also omitted references to the forwards and futures in the diagrams of the transactions. The use of either the forward contracts and/or futures contracts and the lack of any detailed discussion in the Report does not alter my opinions regarding the Solo Trades as detailed herein. Lastly, I did not diagram the so-called "unwind" of the transactions as it was moot since if there was no stock ever transferred in the first instance, then there could be no unwind.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 11



**Figure 2 – The Solo Trades in Effect**

## V.    FACTUAL BACKGROUND[8]

### A.    Overview of the pension plan groups, plan participants, and associated LLCs

19. Solo Capital and its affiliates coordinated the creation of the Plans from 2012-2015, each of which purportedly traded through Solo Capital and/or one of Solo Capital's three affiliated entities, Telesto Markets LLP, Old Park Lane Capital PLC, and West Point Derivatives Limited (together, the "Solo Custodians").  For purposes of this report, I have grouped each of the Plans into one of four broad groups based on the individuals who were responsible for recruiting participants to create these Plans.

---

[8] My understanding of the factual background is based upon various sources of information including, but not limited to, pleadings in this case, deposition transcripts, documents produced by the parties in this matter, discussions with counsel, and publicly available documents.  This recitation of the factual background serves to provide only a background summary of the facts as I understand them.  It is my understanding that the factual foundation and predicates for the facts set forth in this section of my report will be laid by fact witnesses at trial and through other evidentiary materials and will form the factual predicate for any opinions contained herein that are based upon such facts.

### 1.    Argre Plans[9]

20. The "Argre Plans" refers to the 30 Plans created by the four principals of the Argre investment firm—Jerome Lhote ("Lhote"), Richard Markowitz ("Markowitz"), Matthew Stein ("Stein") and John van Merkensteijn ("van Merkensteijn")—as well as friends and family recruited by these four individuals.[10]  The Argre Plans were created in 2012 and 2013.

21. During this period, Lhote, Markowitz, Stein, and van Merkensteijn each created two Plans individually and three Plans jointly.[11]  They also recruited friends and family members to create 19 more LLCs and Plans.[12]

22. Fifteen of the friends and family Plans entered into partnership agreements with entities controlled by the four Argre principals.  In each partnership arrangement, the Plan undertook all the Solo Trades in its name, as an undisclosed agent or nominee for the partnership, and transferred almost all of the proceeds that SKAT paid the Plan, net of fees to Solo Capital and others, to the entities controlled by the Argre principals.  After paying Solo Capital and other fees, the Plan retained only 5% (for 10 of the Plans) or 10% (for five of the Plans) of any profits generated by those Plans' purported assets and paid the remaining 90 to 95% to the entities controlled by the Argre principals.[13]

23. Together, SKAT paid the 30 Argre Plans DKK 1,595,008,695 (USD $288,335,443).[14]

### 2.    Kaye Scholer Plans[15]

24. The "Kaye Scholer Plans" refers to 39 Plans created by van Merkensteijn, Markowitz, Robert Klugman ("Klugman") and friends and family recruited by van Merkensteijn and Markowitz.[16]  Thirty-four of the 39 Plans were established in 2014 with the assistance of

---

[9] See Exhibit 1.01 for additional information about these 30 Plans.
[10] See Exhibit 1.01.
[11] See Exhibit 1.01.
[12] See Exhibit 1.01.
[13] The four Argre principals split the 90 to 95% evenly.  In seven of the partnerships, the Plans' partner was Quartet Investment Partners LLC, an entity in which each of the four Argre principals had an equal 25% interest.  In the remaining partnerships, the Plans partnered with four separate entities, one controlled by each of the four Argre principals, and each with a 23.75% interest in the partnership's profits.  See Exhibit 1.01 for a listing of the partnership agreements.
[14] See Exhibit 1.01.
[15] See Exhibit 1.02 for additional information about these 39 Plans.
[16] See Exhibit 1.02.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 13

Michael Ben-Jacob ("Ben-Jacob"), a partner at the law firm Kaye Scholer in New York.[17]

25. Markowitz and van Merkensteijn each formed four LLCs and associated Plans, and their business associate Klugman formed three LLCs and five associated Plans.[18]

26. Markowitz and van Merkensteijn recruited six of their friends and family to form 26 other LLCs and associated Plans.[19]  Each of these 26 Plans entered into general partnership agreements with two of the following three trusts controlled by Markowitz, van Merkensteijn, and Klugman:

- the Routt Capital Trust (controlled by Markowitz);
- the Omineca Trust (controlled by van Merkensteijn); and
- the RAK Investment Trust (controlled by Klugman).

27. Similar to the Argre partnership arrangements, in each of the 26 partnerships, the Plan undertook all the Solo Trades in its name, as an undisclosed agent or nominee for the partnership, and transferred almost all of the proceeds that SKAT paid the Plan, net of fees to Solo Capital and others, to two of these three trusts.[20]  Together, SKAT paid these 26 Plans DKK 1,626,827,633 (USD $242,949,205).[21]  After paying Solo Capital and the Markowitz/van Merkensteijn/Klugman trusts, the Plans generally retained only 5% of any profits generated by those Plans' purported assets.[22]  The two trust partners in turn received 95% of the profits generated by the Plans' purported assets.[23]  For example, if the Plan was due to receive proceeds of any Danish reclaim, the Plan in a partnership arrangement retained only 5% of the refund claim proceeds after all fees were paid.  The other 95% was paid to the other two general partners.  The RAK Trust was one of the two general partners in each of the 26 partnerships and was entitled to 25% or 31.67% of the profits.[24]  Routt Trust, which was the third general partner in 15 of the partnerships, and Omineca Trust, which served as the third general partner in 11 of the partnerships, received the remaining 70% or 63.33% of

---

[17] See Exhibit 1.02; WH_MDL_00297405 (Ex. 2265).
[18] See Exhibit 1.02.
[19] See Exhibit 1.02.
[20] See Exhibit 1.02 for a listing of the partnership agreements.
[21] See Exhibit 1.02.
[22] See Exhibit 1.02 for a listing of the partnership agreements.
[23] See Exhibit 1.02 for a listing of the partnership agreements.
[24] See Exhibit 1.02 for a listing of the partnership agreements.

the profits in those partnerships.[25]

### 3.    Lehman Plans[26]

28. Roger Lehman began working with Solo in early 2013 while separately employed by FGC Securities.[27]  Lehman ultimately created five of his own LLCs and associated Plans.[28] Lehman also worked with his brother to assist three of his brother's friends to create LLCs and Plans and helped others establish LLCs and Plans.[29]

29. Initially, Lehman helped Shah recruit Matthew Tucci ("Tucci"), Doston Bradley ("Bradley") and at least two others who worked together at the Traditions Group, to join the scheme in late 2013.[30]  At the same time, Lehman assisted individuals who had been introduced to the scheme through Jonathan Godson to establish LLCs and Plans.[31]  In total, these groups initially established 19 Plans that started participating in Solo Trades in late 2013 and early 2014.[32]

30. Beginning in summer 2014, Lehman, Bradley, Tucci, and Gavin Crescenzo ("Crescenzo") each recruited multiple friends and/or family members to be participants in newly formed Plans.  As part of this second wave, in late 2014 and 2015, another 81 Plans were formed by these recruiters and their friends and families.[33]

31. In total, there were 100 Plans associated with the Lehman/Tucci/Bradley/Crescenzo group (the "Lehman Plans").  Together, SKAT paid these 100 Plans DKK 3,921,116,742 (USD $603,205,921).[34]  As detailed below, most of the Plans in the Lehman Group ultimately received none of the dividend withholding tax refunds paid by SKAT.  Instead, the vast majority of the money was paid to Ganymede Cayman Limited ("Ganymede"), a Cayman entity owned by Shah.  Ganymede then paid a small proportion of the proceeds back to the U.S. recruiters Lehman, Tucci, Bradley, and Crescenzo.  A *de minimus* percentage of the

---

[25] See Exhibit 1.02 for a listing of the partnership agreements.
[26] See Exhibit 1.03 for additional information about these 100 plans.
[27] Lehman Dep. Tr. at 69:24 – 70:21.
[28] See Exhibit 1.03.
[29] Lehman Dep. Tr. at 413:23 – 415:17; see Exhibit 1.03.
[30] Lehman Dep. Tr. at 314:1-19.
[31] Lehman Dep. Tr. at 326:11 – 327:7.
[32] See Exhibit 1.03.
[33] See Exhibit 1.03.
[34] See Exhibit 1.03.

refunds (if anything) was paid to the other plan participants.[35]

### 4. The Zeta Plans

32. Zeta Financial Partners Limited ("Zeta"), a British Virgin Islands based entity, acted as the investment manager for four Plans, the Acorn Capital Corporation Employee Profit Sharing Plan ("ACC"), the Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan ("ACS"), the Sander Gerber Pension Plan ("SGPP"), and the Sterling Alpha Plan (collectively, the "Zeta Plans").[36]  The Plan participants in these Plans—Gregory Summers (ACC and ACS), Sander Gerber (SGPP), and John Doscas (Sterling Alpha)—were business associates of one another.[37]  In total, the Zeta Plans claimed approximately DKK 24,329,700 (USD $4,296,259) in withholding tax refunds from SKAT based on Solo Trades.[38]

### B. Overview of "Bellwether" Plans

33. I have been informed by Counsel that, with respect to Plans that used Solo Capital, Telesto, Old Park Lane, and/or West Point as custodian, the Court directed the parties in this litigation to jointly agree and select one Plan that traded in 2012 or 2013, and four Plans that traded in 2014 or 2015, to be considered "Bellwether Plans" for purposes of summary judgment motions, and for each of these five selections, to choose two backup Plans.  To date, it is my understanding that the parties have been unable to reach final agreement on which 15 Plans would comprise the Bellwether Plans.  Accordingly, Counsel has informed me which Plans the parties have agreed upon and Counsel selected the remaining three Plans for me to examine and discuss in this Report.  For this reason, I have focused on the specific details of these Bellwether Plans, but I have found that the key aspects of these Bellwether Plans are consistent with my review of the remaining Plans and their involvement with the Solo Trades.  If the parties ever reach agreement on the final Plan selection, or the Court directs

---

[35] See Opinion II.
[36] Summers Dep. Tr. 43:2;13, 145:16 – 148:3.
[37] Summers Dep. Tr. 20:20-22:3.
[38] SKAT_MDL_001_038054; SKAT_MDL_001_038340; SKAT_MDL_001_038417; SKAT_MDL_001_040745; SKAT_MDL_001_044688.

otherwise, I will update my Report accordingly.[39]

34. The following section of my Report provides an overview of the formation of the 15 Bellwether Plans and the refund applications they filed with SKAT.

### Table 1 – Summary of Bellwether Plans

| Bellwether Number | Name of Plan | Date Formed |
|---|---|---|
| 1 | Bernina Plan | February 7, 2013 |
| 1a | RJM Capital Pension Plan | February 1, 2013 |
| 1b | Delvian LLC Solo 401(K) Plan | May 23, 2012 |
| 2 | Basalt Ventures LLC Roth 401(K) Plan | July 22, 2014 |
| 2a | STOR Capital Consulting LLC 401(K) Plan | May 14, 2014 |
| 2b | Edgepoint Capital LLC Roth 401(K) Plan | July 16, 2014 |
| 3 | Loggerhead Services LLC Roth 401(K) Plan | July 18, 2014 |
| 3a | Roadcraft Technologies LLC Roth 401(K) Plan | July 21, 2014 |
| 3b | The Bareroot Capital Investments LLC 401(K) Plan | July 17, 2014 |
| 4 | FWC Capital LLC Pension Plan | October 22, 2014 |
| 4a | The LBR Capital Pension Plan | September 26, 2014 |
| 4b | The Costello Advisors Pension Plan | December 3, 2014 |
| 5 | The Proper Pacific LLC 401(K) Plan | September 26, 2014 |
| 5a | The SVP 401(K) Plan | January 26, 2015 |
| 5b | The Oaks Group Pension Plan | September 30, 2014 |

### 1.    Bellwether Plan 1: Bernina Pension Plan

35. Bernina LLC, a Delaware limited liability company, was formed on March 15, 2012.[40]  On February 7, 2013, Bernina LLC formed the Bernina Pension Plan (the "Bernina Plan") and the Bernina Pension Plan Trust for which van Merkensteijn was named the trustee.[41]

36. The Bernina Plan was one of the 30 Argre Plans formed in 2012-2013.

37. The Bernina Plan completed its first group of Solo Trades on March 7, 2013 and filed its first dividend tax refund claim with SKAT on April 9, 2013 through the payment agent Acupay

---

[39] I understand that Avanix Management LLC Roth 401(k) Plan has been added as a Bellwether Plan.  I reserve the right to supplement my report with respect to this plan.
[40] JHVM_0020353.
[41] WH_MDL_00252474; JHVM_0017740.

Systems.[42]  From March 2013 through September 2014, the Bernina Plan filed 23 refund claims with SKAT totaling DKK 57,878,013 (USD $10,445,527).[43]

### 2.    Bellwether Plan 1a: RJM Capital Pension Plan

38. RJM Capital LLC, a Delaware limited liability company, was formed on July 17, 2007.[44]  On February 1, 2013, RJM Capital LLC formed the RJM Capital Pension Plan (the "RJM Plan") and the RJM Capital Pension Plan Trust for which Markowitz was named the trustee.[45]

39. The RJM Plan was one of the 30 Argre Plans formed in 2012-2013.

40. The RJM Plan completed its first group of Solo Trades on March 7, 2013 and filed its first divided tax refund claim with SKAT on April 3, 2013 through payment agent Goal Taxback Limited.[46]  From April 2013 through September 2014, the RJM Plan filed 24 refund claims with SKAT totaling DKK 59,487,352 (USD $10,745,718).[47]

### 3.    Bellwether Plan 1b: Delvian LLC Solo 401(K) Plan

41. Delvian LLC, a Delaware limited liability company, was formed on January 13, 2011.[48]  On May 23, 2012, Delvian LLC formed the Delvian LLC Solo 401(K) Plan (the "Delvian Plan") and the Delvian LLC Pension Plan Trust for which Alicia Colodner ("Colodner") was named the trustee.[49]

42. The Delvian Plan was one of the 30 Argre Plans formed in 2012-2013.  Colodner was an employee of Argre.[50]

43. In May 2012, the Delvian Plan entered into the Delvian General Partnership with Quartet Investment Partners LLC ("Quartet").[51]  Quartet was formed by the Argre principals in April 2012, and its four equal members were Stein, Lhote, Markowitz and van Merkensteijn.[52]  The

---

[42] See Exhibit 2.01 and Exhibit 3.
[43] See Exhibit 2.01 for a complete list of the refund claims filed by this Plan.
[44] WH_MDL_00358608.
[45] WH_MDL_00331778; MPSKAT00004346; MPSKAT00004322.
[46] See Exhibit 2.02 and Exhibit 3.
[47] See Exhibit 2.02 for a complete list of the refund claims filed by this Plan.
[48] MPSKAT00274815; GUNDERSON 00010029 at -10034.
[49] MPSKAT00024513; MPSKAT00024487; MPSKAT00024486.
[50] GUNDERSON 00010029 at -10034.
[51] MPSKAT00056668.
[52] MPSKAT00057018-00057043.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 18

Delvian Plan owned a 5% interest in the partnership and Quartet owned a 95% interest.[53]
Adam LaRosa was appointed the manager of the partnership.[54]

44. In February 2013, the Delvian Plan formed a new general partnership with AOI Pension Plan Trust (Stein's trust), Ganesha Industries Pension Plan Trust (Lhote's trust), Bernina Pension Plan Trust (van Merkensteijn's trust), and RJM Capital Pension Plan Trust (Markowitz's trust).[55] The Delvian Plan owned a 5% interest in the partnership and the other four partners each owned a 23.75% interest.[56] Adam LaRosa was appointed the manager of the partnership.[57]

45. The Delvian Plan completed its first group of Solo Trades on August 8, 2012 and filed its first dividend tax refund claim with SKAT on August 31, 2012 through payment agent Goal Taxback Limited.[58] From August 2012 through August 2014, the Delvian Plan filed 28 refund claims with SKAT totaling DKK 67,197,056 (USD $12,070,860).[59]

### 4.  Bellwether Plan 2: Basalt Ventures LLC Roth 401(K) Plan

46. Basalt Ventures LLC, a Delaware limited liability company, was formed on June 16, 2014.[60] On July 22, 2014, Basalt Ventures LLC formed the Basalt Ventures LLC Roth 401(K) Plan (the "Basalt Plan") for which van Merkensteijn was named the trustee.[61]

47. The Basalt Plan was one of the 39 Kaye Scholer Plans formed in 2014.

48. The Basalt Plan completed its first Solo Trades on August 7, 2014, less than three weeks after its formation, and filed its first dividend tax refund claim with SKAT on November 27, 2014 through payment agent Goal Taxback Limited.[62] From November 2014 through May 2015, the Basalt Plan filed 15 refund claims with SKAT totaling DKK 27,853,529 (USD $4,036,858).[63]

---

[53] MPSKAT00056668.
[54] MPSKAT00056668.
[55] MPSKAT00056658, MPSKAT00020864; MPSKAT00025932; JHVM_0017740; MPSKAT00004327.
[56] MPSKAT00056658.
[57] MPSKAT00056658.
[58] See Exhibit 2.03 and Exhibit 3.
[59] See Exhibit 2.03 for a complete list of the refund claims filed by this Plan.
[60] JHVM_0001927.
[61] WH_MDL_00339896; JHVM_0002517.
[62] See Exhibit 2.04 and Exhibit 3.
[63] See Exhibit 2.04 for a complete list of the refund claims filed by this Plan.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 19

### 5. Bellwether Plan 2a: STOR Capital Consulting LLC 401(K) Plan

49. STOR Capital Consulting LLC, a New York limited liability company, was formed on December 17, 2008.[64]  On May 14, 2014, STOR Capital Consulting LLC formed the STOR Capital Consulting LLC 401(K) Plan (the "STOR Plan") for which Klugman was named the trustee.[65]

50. The STOR Plan was one of the 39 Kaye Scholer Plans formed in 2014.

51. The STOR Plan completed its first group of Solo Trades on February 25, 2015 and filed its first dividend tax refund claim with SKAT on April 23, 2015 through payment agent Goal Tax Back Limited.[66]  In April and May 2015, the STOR Plan filed 14 refund claims with SKAT totaling DKK 26,951,956 (USD $3,933,507).[67]

### 6. Bellwether Plan 2b: Edgepoint Capital LLC Roth 401(K) Plan

52. Edgepoint Capital LLC, a Delaware limited liability company, was formed on June 16, 2014.[68]  On July 16, 2014, Edgepoint Capital LLC formed the Edgepoint Capital LLC Roth 401(K) Plan (the "Edgepoint Plan") for which Klugman was named the trustee.[69]

53. The Edgepoint Plan was one of the 39 Kaye Scholer Plans formed in 2014.

54. The Edgepoint Plan completed its first group of Solo Trades on August 7, 2014 and filed its first dividend tax refund claim with SKAT on October 28, 2014 through payment agent Syntax.[70]  From October 2014 through May 2015, the Edgepoint Plan filed 16 refund claims with SKAT totaling DKK 31,328,376 (USD $4,729,295).[71]

### 7. Bellwether Plan 3: Loggerhead Services LLC Roth 401(K) Plan

55. Loggerhead Services LLC, a Delaware limited liability company, was formed on June 16,

---

[64] KLUGMAN00004330.
[65] KLUGMAN00004141; KLUGMAN00004278.
[66] See Exhibit 2.05 and Exhibit 3.
[67] See Exhibit 2.05 for a complete list of the refund claims filed by this Plan.
[68] KLUGMAN00004479
[69] KLUGMAN00041104; KLUGMAN00004484.  It should be noted that the Edgepoint Plan formation document incorrectly lists Edgepoint Capital LLC as a Connecticut Limited Liability in the Preamble (KLUGMAN00041104 at -41108).
[70] See Exhibit 2.06 and Exhibit 3.  *See also* SKAT_MDL_001_014586.
[71] See Exhibit 2.06 for a complete list of the refund claims filed by this Plan.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 20

2014.[72]  On July 18, 2014, Loggerhead Services LLC formed the Loggerhead Services LLC Roth 401(K) Plan (the "Loggerhead Plan") for which Perry Lerner ("Lerner") was named the trustee.[73]

56. In August 2014, the Loggerhead Plan entered into the Loggerhead Services General Partnership with RAK Investment Trust and Routt Capital Trust.[74]  The Loggerhead Plan owned a 5% interest in the partnership; RAK Investment Trust owned a 25% interest; and Routt Capital Trust owned a 70% interest.[75]  Van Merkensteijn was appointed the manager of the partnership.[76]

57. The Loggerhead Plan was one of the 39 Kaye Scholer Plans formed in 2014.  Lerner is a friend of van Merkensteijn.[77]

58. The Loggerhead Plan completed its first group of Solo Trades on August 7, 2014 and filed its first dividend tax refund claim with SKAT on November 13, 2014, through payment agent Acupay Systems.[78]  From November 2014 through May 2015, the Loggerhead Plan filed 15 refund claims with SKAT totaling DKK 68,808,375 (USD $10,095,834).[79]

### 8.    Bellwether Plan 3a: Roadcraft Technologies LLC Roth 401(K) Plan

59. Roadcraft Technologies LLC, a Delaware limited liability company, was formed on June 16, 2014.[80]  On July 21, 2014, Roadcraft Technologies LLC formed the Roadcraft Technologies LLC Roth 401(K) Plan (the "Roadcraft Plan") for which Ronald Altbach was named the trustee.[81]

60. In August 2014, the Roadcraft Plan entered into the Roadcraft Technologies General

---

[72] WH_MDL_00029041.
[73] WH_MDL_00012226; WH_MDL_00012017.  It should be noted that the Loggerhead Plan formation document incorrectly lists Loggerhead Services LLC as a Pennsylvania Limited Liability in the Preamble (WH_MDL_00012226 at -122230).
[74] WH_MDL_00012567.
[75] WH_MDL_00012567.
[76] WH_MDL_00012567.
[77] Lerner Dep. Tr. 40:16-23.
[78] See Exhibit 2.07 and Exhibit 3.
[79] See Exhibit 2.07 for a complete list of the refund claims filed by this Plan.
[80] WH_MDL_00029159.
[81] WH_MDL_00024858; WH_MDL_00023941.  It should be noted that the Roadcraft Plan formation document incorrectly lists Roadcraft Technologies LLC as a New York Limited Liability in the Preamble (WH_MDL_00024858 at -24862).

Partnership with RAK Investment Trust and Routt Capital Trust.[82]  The Roadcraft Plan owned a 5% interest in the partnership; RAK Investment Trust owned a 25% interest; and Routt Capital Trust owned a 70% interest.[83]  Van Merkensteijn was appointed the manager of the partnership.[84]

61. The Roadcraft Plan was one of the 39 Kaye Scholer Plans formed in 2014.  Altbach is a friend of van Merkensteijn.[85]

62. The Roadcraft Plan completed its first group of Solo Trades on August 7, 2014 and filed its first dividend tax refund claim with SKAT on November 27, 2014 through payment agent Goal Taxback Limited.[86]  From November 2014 through May 2015, the Roadcraft Plan filed 15 refund claims with SKAT totaling DKK 67,971,038 (USD $10,036,193).[87]

### 9. Bellwether Plan 3b: The Bareroot Capital Investments LLC 401(K) Plan

63. Bareroot Capital Investments LLC, a Delaware limited liability company, was formed on June 16, 2014.[88]  On July 17, 2014, Bareroot Capital Investments LLC formed the Bareroot Capital Investments LLC Roth 401(K) Plan (the "Bareroot Plan") for which David Zelman ("Zelman") was named the trustee.[89]

64. In August 2014, the Bareroot Plan entered into the Bareroot Capital Investments General Partnership with RAK Investment Trust and Routt Capital Trust.[90]  The Bareroot Plan owned a 5% interest in the partnership; RAK Investment Trust owned a 25% interest; and Routt Capital Trust owned a 70% interest.[91]  Van Merkensteijn was appointed the manager of the partnership.[92]

65. The Bareroot Plan was one of the 39 Kaye Scholer Plans formed in 2014.  Zelman is a friend

---

[82] WH_MDL_00029401.
[83] WH_MDL_00029401.
[84] WH_MDL_00029401.
[85] R. Altbach Dep. Tr. at 27:19-22.
[86] See Exhibit 2.08 and Exhibit 3.
[87] See Exhibit 2.08 for a complete list of the refund claims filed by this Plan.
[88] WH_MDL_00225982.
[89] MBJ_0000005; WH_MDL_00023939.
[90] WH_MDL_00029366.
[91] WH_MDL_00029366.
[92] WH_MDL_00029366.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 22

of van Merkensteijn.[93]

66. The Bareroot Plan completed its first group of Solo Trades on August 7, 2014 and filed its first dividend tax refund claim with SKAT on October 28, 2014 through payment agent Syntax.[94]  From October 2014 through May 2015, the Bareroot Plan filed 15 refund claims with SKAT totaling DKK 28,899,434 (USD $4,240,726).[95]

## 10.    Bellwether Plan 4: FWC Capital LLC Pension Plan

67. The FWC Capital LLC, a Delaware limited liability company, was formed on October 13, 2014.[96]  On October 22, 2014, The FWC Capital LLC formed The FWC Capital LLC Pension Plan (the "FWC Plan") and the FWC Investment Trust for which Lehman was named the trustee.[97]

68. The FWC Plan was one of the 100 Lehman Plans formed in 2013-2015.

69. The FWC Plan completed its first group of Solo Trades on November 27, 2014 and filed its first dividend tax refund claim with SKAT on April 13, 2015 through payment agent Syntax GIS.[98]  In April and May 2015, the FWC Plan filed 16 refund claims with SKAT totaling DKK 70,930,261 (USD $10,231,517).[99]

## 11.    Bellwether Plan 4a:  The LBR Capital Pension Plan

70. London India LLC, a Delaware limited liability company, was formed on September 3, 2014.[100]  On September 26, 2014, London India LLC formed The LBR Capital LLC Pension Plan (the "LBR Plan") and the DB5 Trust for which Bradley was named the trustee.[101]  Bradley was the sole participant in the LBR Plan.[102]

71. The LBR Plan was one of the 100 Lehman Plans formed in 2013-2015.

---

[93] R. Altbach Tr. at 27:19-22.
[94] See Exhibit 2.09 and Exhibit 3.
[95] See Exhibit 2.09 for a complete list of the refund claims filed by this Plan.
[96] LEHMAN00015606.
[97] FWWCCAP00000414; FWCCAP00000424; FWCCAP00000457; FWCCAP00000494; FWCCAP00000536; FWCCAP00000548; FWCCAP00000547.
[98] See Exhibit 2.10 and Exhibit 3.
[99] See Exhibit 2.10 for a complete list of the refund claims filed by this Plan.
[100] LBR00000391.
[101] LBR00000410; LBR00000486; LBR00000547; LBR00000351; LBR00000347.
[102] See Exhibit 2.11; ELYSIUM-05822425.

72. The LBR Plan completed its first group of Solo Trades on November 27, 2014 and filed its first dividend tax refund claim with SKAT on April 14, 2015 through payment agent Goal Taxback Limited.[103]  In April and May 2015, the LBR Plan filed 16 refund claims with SKAT totaling DKK 28,571,489 (USD $4,117,901).[104]

### 12.    Bellwether Plan 4b: The Costello Advisors Pension Plan

73. Costello Advisors LLC, a Missouri limited liability company, was formed on November 7, 2014.[105]  On December 3, 2014, Costello Advisors LLC formed the Costello Advisors LLC Pension Plan (the "Costello Plan") and the Costello Investment Trust for which Crescenzo was named the trustee.[106]

74. The Costello Plan was one of the 100 Lehman Plans formed in 2013-2015.

75. The Costello Plan completed its first group of Solo Trades on February 25, 2015 and filed its first dividend tax refund claim with SKAT on May 7, 2015 through payment agent Goal Taxback Limited.[107]  In May 2015, the Costello Plan filed 14 refund claims with SKAT totaling DKK 27,167,553 (USD $4,102,226).[108]

### 13.    Bellwether Plan 5: The Proper Pacific LLC 401(K) Plan

76. Pacific India LLC, a Delaware limited liability company, was formed on September 3, 2014.[109]  On September 26, 2014, Pacific India LLC formed the Proper Pacific LLC 401(K) Plan (the "Proper Pacific Plan") and the DB4 Investment Trust for which Bradley was named the trustee.[110]

77. The Proper Pacific Plan was one of the 100 Lehman Plans formed in 2013-2015.

78. The Proper Pacific Plan completed its first group of Solo Trades on November 27, 2014 and filed its first dividend tax refund claim with SKAT on April 20, 2015 through payment agent

---

[103] See Exhibit 2.11 and Exhibit 3.
[104] See Exhibit 2.11 for a complete list of the refund claims filed by this Plan.
[105] LBR00000391.
[106] COSTELLO00000338; COSTELLO00000472; COSTELLO00000469.
[107] See Exhibit 2.12 and Exhibit 3.
[108] See Exhibit 2.12 for a complete list of the refund claims filed by this Plan.
[109] PACIFIC00000375.
[110] PACIFIC00003619; PACIFIC00003628; PACIFIC00003696; PACFIC00000326; PACIFIC00000322.

Goal Taxback Limited.[111]  In April and May 2015, the Proper Pacific Plan filed 16 refund claims with SKAT totaling DKK 29,035,894 (USD $4,199,026).[112]

### 14.    Bellwether Plan 5a:  The SVP 401(K) Plan

79. SVP Advisors LLC, a New York limited liability company, was formed on January 13, 2015.[113]  On January 26, 2015, SVP Advisors LLC formed The SVP 401(K) Plan (the "SVP Plan") and the SVP Investment Trust for which Svetlin Petkov was named the trustee.[114]

80. The SVP Plan was one of the 100 Lehman Plans formed in 2013-2015.

81. The SVP Plan completed its first group of Solo Trades on February 25, 2015 and filed its first dividend tax refund claim with SKAT on May 26, 2015 through payment agent Syntax GIS.[115]  In May 2015, the SVP Plan filed 14 refund claims with SKAT totaling DKK 25,752,508 (USD $3,757,351).[116]

### 15.    Bellwether Plan 5b: The Oaks Group Pension Plan

82. The Oaks Group LLC, a Delaware limited liability company, was formed on August 29, 2014.[117]  On September 30, 2014, The Oaks Group LLC formed The Oaks Group Pension Plan (the "Oaks Group Plan") and the MCT1 Investment Trust for which Matthew Tucci was named the trustee.[118]

83. The Oaks Group Plan was one of the 100 Lehman Plans formed in 2013-2015.

84. The Oaks Group Plan completed its first group of Solo Trades on November 27, 2014 and filed its first dividend tax refund claim with SKAT on April 17, 2015 through payment agent Acupay Systems.[119]  In April and May 2015, the Oaks Group Plan filed 16 refund claims with SKAT totaling DKK 69,805,930 (USD $10,223,991).[120]

---

[111] See Exhibit 2.13 and Exhibit 3.
[112] See Exhibit 2.13 for a complete list of the refund claims filed by this Plan.
[113] SVP00000316; SVP00000338.
[114] SVP00000342; SVP00000352; SVP00000385; SVP00000422; SVP00000464; SVP00000472; SVP00000317.
[115] See Exhibit 2.14 and Exhibit 3.
[116] See Exhibit 3.14 for a complete list of the refund claims filed by this Plan.
[117] OAKS00000401.
[118] OAKS00000446; OAKS00000489; OAKS00000532; OAKS00000379; OAKS00000308.
[119] See Exhibit 2.15 and Exhibit 3.
[120] See Exhibit 2.15 for a complete list of the refund claims filed by this Plan.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 25

### C.    Overview of Solo Capital, related entities, and the people behind the entities

#### 1.    Solo Capital Partners LLP

85. Solo Capital Partners LLP was incorporated in September 2011 and was based in the United Kingdom.[121]  It allegedly provided global security services, investment management, brokerage and proprietary trading services.[122]  The company was controlled by Sanjay Shah ("Shah").[123]

86. In 2014, Solo Capital Partners LLP appears to have entered into a Service Level Agreement with the other Solo-affiliated brokers (Old Park Lane PLC, West Point Derivatives Limited, Telesto Markets LLP) whereby Solo Capital Partners LLP "white labeled" its custody and clearing services and essentially acted as a sub-custodian for the other Solo-affiliated brokers.[124]

87. Additionally, Solo Capital Partners LLP appears to have entered into Guarantee Agreements with certain Plans and brokers at least as early as 2012 whereby Solo Capital Partners LLP guaranteed the delivery and payment obligations of the Plans with respect to the Solo Trades.[125]  In the event of a default, Solo Capital Partners LLP "hereby irrevocably and unconditionally guarantees to the [broker] the punctual performance by the [Plan] of its obligations to deliver shares (in the case of a share sale) or pay the purchase price (in the case of a share purchase) to the [broker]..." [126]

88. I reviewed the audited financial statements for Solo Capital Partners LLP from 2012 through 2015 to assess the company's financial wherewithal to guarantee the Solo Trades.  As shown in the chart below, the total assets of the company fluctuated from GBP 12.3 million to GBP 71.4 million (or approximately USD $19.6 million to USD $105.9 million), leaving the company significantly undercapitalized to be purportedly clearing and guaranteeing the Solo Trades which, at times on an aggregate basis, exceeded billions of dollars a day.

---

[121] Report and Financial Statements for Solo Capital Partners, March 31, 2012, p.3.
[122] Report and Financial Statements for Solo Capital Partners, March 31, 2013, p.3.
[123] Report and Financial Statements for Solo Capital Partners, March 31, 2012, p.10.
[124] ELYSIUM-03283228; KLUGMAN00006705.
[125] See, for example, MPSKAT00003810, MPSKAT00024030.
[126] MPSKAT00024030.

| (in GBP) | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 |
|---|---|---|---|---|
| Total Assets | £  12,283,795 | £  21,602,152 | £  21,483,492 | £  71,371,398 |
| Total Liabilities | (909,905) | (1,531,150) | (2,270,513) | (53,172,808) |
| Equity | £  11,373,890 | £  20,071,002 | £  19,212,979 | £  18,198,590 |
| | | | | |
| Operating Profit | | £  10,446,537 | £  3,679,089 | £  4,169,042 |

**Figure 3 – Financial Snapshot of Solo Capital Partners LLP**

89. On September 22, 2016, Solo Capital Partners LLP formally entered into Special
Administration Regime insolvency proceedings in the United Kingdom.[127]

## 2.    Solo Capital Limited

90. Solo Capital Limited was incorporated in 2009 and allegedly operated as a fund management
company and brokerage.[128]  The company also engaged in proprietary trading starting in the
2012 fiscal year.[129]  Shah owned all the shares in Solo Capital Limited and was the
company's ultimate controller.[130]

91. Solo Capital (Dubai) Limited was incorporated in December 2011 as a fully owned
subsidiary of Solo Capital Limited.  The subsidiary provides management support and other
support functions to Solo Capital Partners LLP and Solo Capital Limited.[131]

92. I reviewed the audited financial statements for Solo Capital Limited from 2010 through 2015.
As shown in the chart below, the company reported an operating loss in four of its five years
in operation.

---

[127] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[128] Director's Report and Financial Statements for Solo Capital Limited, March 31, 2010, p.1.
[129] Director's Report and Financial Statements for Solo Capital Limited, March 31, 2012, p.1.
[130] Director's Report and Financial Statements for Solo Capital Limited, March 31, 2010, p.2,13.
[131] Director's Report and Financial Statements for Solo Capital Limited, March 31, 2012, p.1.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 27

| (in GBP) | 1/14/2009 - 3/31/2010 | 3/31/2011 | 3/31/2012 | 3/31/2013 | 3/31/2014 | 3/31/2015 |
|---|---|---|---|---|---|---|
| Total Assets | £    266,706 | £  1,508,759 | £ 16,369,926 | £  149,224,892 | £  21,790,399 | £    786,942 |
| Total Liabilities | (151,934) | (661,180) | (3,854,695) | (134,782,738) | (2,114,575) | (70,624) |
| Equity | £    114,772 | £    847,579 | £ 12,515,231 | £   14,442,154 | £  19,675,824 | £    716,318 |
| Operating (Loss)/Profit | £        (244) | £    (34,632) | £    (564,959) | £     1,697,464 | £  (1,959,194) | £      (3,563) |

**Figure 4 – Financial Snapshot of Solo Capital Limited**

93. After the 2015 fiscal year, the company ceased operations and entered voluntary liquidation.[132]

### 3.    West Point Derivatives Limited

94. West Point Derivatives Limited ("West Point") allegedly operated as a broker in derivatives.[133]  The company was controlled by Shah.[134]

95. I reviewed the audited financial statements for West Point from 2012 through 2015.  As shown in the chart below, the company never held more than GBP 2.1 million (or approximately USD $3.0 million) in total assets and never recorded an operating profit.[135]  As such, West Point would not have had sufficient liquidity to purportedly clear and settle the Solo Trades.

---

[132] Director's Report and Financial Statements for Solo Capital Limited, March 31, 2015, p.1.
[133] Report and Financial Statements for West Point Derivatives Limited, December 31, 2013, p.3.
[134] Report and Financial Statements for West Point Derivatives Limited, December 31, 2013, p.13.
[135] Audited financial statements were not available as of December 31, 2014.  Instead, the financial statements dated March 31, 2015 was presented for the 15-month period from January 1, 2014 through March 31, 2015.

| (in GBP) | | 12/31/2012 | | 12/31/2013 | | 1/1/2014 – 3/31/2015 |
|---|---|---|---|---|---|---|
| Total Assets | £ | 586,265 | £ | 436,364 | £ | 2,054,399 |
| Total Liabilities | | (5,252) | | (2,772) | | (505) |
| Equity | £ | 581,013 | £ | 433,592 | £ | 2,053,894 |
| Operating Loss | £ | (19,312) | £ | (139,910) | £ | (1,138,647) |

**Figure 5 – Financial Snapshot of West Point**

96. On September 22, 2016, West Point formally entered into Administration in the United Kingdom.[136]

### 4.    Old Park Lane Capital PLC

97. Old Park Lane Capital PLC ("Old Park Lane") operated as an agency stockbroker and corporate broker.[137]  The company was owned by Shah.[138]

98. I reviewed the audited financial statements for Old Park Lane from 2012 through 2013.[139] As shown in the chart below, the company never held more than GBP 1.1 million (or approximately USD $1.8 million) in total assets.  Similar to Solo Capital Partners and West Point, Old Park Lane lacked the capital and liquidity to purportedly clear and settle the volume of the purported Solo Trades.

---

[136] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[137] Directors' Report and Financial Statements for Old Park Lane Capital PLC, December 31, 2012, p.1.
[138] Financial Conduct Authority, Final Notice 2021: Sapien Capital Limited, May 6, 2021, p. 12.
[139] The financial statements for the Solo-affiliated brokers are publicly available on the United Kingdom's "Companies House" website, located at https://www.gov.uk/government/organisations/companies-house.  However, it appears that not all Solo-affiliated brokers have publicly financials for each year of the relevant time period.  For example, Old Park Lane only had publicly available financials for 2012 and 2013.  As such, my review and analysis was limited to the publicly available information for these companies.

| (in GBP) | 12/31/2012 | 12/31/2013 |
|---|---|---|
| Total Assets | £     1,094,422 | £       580,522 |
| Total Liabilities | (325,220) | (184,125) |
| Equity | £       769,202 | £       396,397 |
| Operating (Loss)/Profit | £       137,644 | £     (478,142) |

**Figure 6 – Financial Snapshot of Old Park Lane**

99. On September 22, 2016, Old Park Lane formally entered into Administration in the United Kingdom.[140]

### 5.    Telesto Markets LLP

100.    Telesto Markets LLP ("Telesto") was authorized in August 2014, but was "dormant" until January 1, 2015, and was a wholesale custody bank and fund administrator.[141]  The company was controlled by Shah.[142]

101.    I reviewed the audited financial statements of Telesto for the three-month period from January 1, 2015 through March 31, 2015.  As shown in the chart below, the company had minimal assets with which to support the purported volume of the Solo Trades. As shown in the chart below, the company never held more than GBP 0.9 million (or approximately USD $1.4 million) in total assets.

---

[140] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[141] Final Notice, Sapien Capital Limited, Financial Conduct Authority, May 6, 2021, at 13.
[142] Report and Financial Statements for Telesto Markets LLP, March 31, 2015, p. 9.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 30

| (in GBP) | | 3/31/2015 |
|---|---|---|
| Total Assets | £ | 921,533 |
| Total Liabilities | | (25,641) |
| Equity | £ | 895,892 |
| Operating Profit | £ | 656,640 |

**Figure 7 – Financial Snapshot of Telesto**

102.    On September 22, 2016, Telesto formally entered into Administration in the United Kingdom.[143]

### 6.    The Solo Group

103.    The Solo Group includes Solo Capital Partners LLP, Westpoint, Old Park Lane and Telesto which are registered under the laws of England and Wales, and are authorized and regulated by the Financial Conduct Authority of the United Kingdom.[144]

### 7.    Ganymede Cayman Limited

104.    Ganymede Cayman Limited ("Ganymede") is a Cayman entity, owned by Shah, to which the Plans undertook to pay the vast majority of the tax refunds that the Plans obtained from SKAT.[145]  Each Plan paid Ganymede a large percentage of its refund for "tax reclaim advisory services" fees that were supposedly provided by Ganymede.[146]

---

[143] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[144] ELYSIUM-04117677.
[145] Deposition of Richard Markowitz dated April 8, 2021, 200:24-201:13.
[146] *See*, for example, Tax Reclaim Advisory Services Agreement between Ganymede and California Catalog Company Pension Plan (MPSKAT00022222).

## 8.    The Counterparties To The Solo Trades

105.    Solo Capital used approximately 75 different entities as counterparties in the Solo Trades, the large majority of which (66) were registered in either the British Virgin Islands or the Cayman Islands.  Most of these entities were affiliated with Solo Capital in various ways. Most were newly formed and thinly capitalized entities.  For example, of the 66 entities in the British Virgin Islands and Cayman Islands, 63 were formed during the relevant period – 2012 through 2015.  In addition, many of the entities had overlapping owners and directors.

### a.    The Short-Sellers

106.    Many of the short-sellers were controlled by the same individuals, many of whom were associated with Sanjay Shah and Solo Capital; and multiple members of the Solo Capital management team were shareholders and directors of the short-sellers Leda Cayman Ltd. and Maven Asset Management Ltd.[147]  Shah himself also acted as a director of these entities.[148] Similarly:

- Michael Stephen Murphy, Founder/CEO/Chairman of Novus Capital Markets Ltd,[149] an entity used as a broker in the Solo Trades and also within the Shah-controlled universe,[150] was a shareholder and director of the short-seller entities Baja Ventures Ltd, Nisus Financial Ltd, Sciron Capital Ltd., and Schmet Investments Ltd.[151]

- Dilip Shah, who was employed by Solo Capital in 2011,[152] controlled four short-sellers: Black Square Ltd., DE Market View, Glendale Market Consultants, and RDKS Consultants.[153]

- Rajeev Dave, whom Sanjay Shah refers to as an old friend in internal Solo Capital

---

[147] *See* CAYMAN_00002942-44, CAYMAN_00002940-41  (Leda); CAYMAN_00002984-86, CAYMAN_00002983 (Metis).  *See* ELYSIUM-00150387 for members of Solo's management team.

[148] *See* CAYMAN_00002940-41 (Leda Register of Directors & Officers); CAYMAN_00002983 (Metis Register of Directors & Officers).

[149] ELYSIUM-05443528 (CV).

[150] ELYSIUM-05295222.

[151] BVI_00002791-92 (Baja); BVI_00009073-74 (Nisus); BVI_00011864-65 (Sciron); BVI_00016296; BVI_00016297 (Schmet).

[152] ELYSIUM-03820584.

[153] CAYMAN_00002616-17, CAYMAN_00002615 (Black Square); CAYMAN_00002797-98, CAYMAN_00002796 (DE Market); CAYMAN_00002885-86, CAYMAN_00002884 (Glendale); CAYMAN_00003156-57, CAYMAN_00003155 (RDKS).

correspondence,[154] controlled three short-sellers: A Squared Investments, Abra
Holdings (Cayman), and SPK 23 (Cayman) Inc.[155]

107.    Available evidence of the short-sellers' financial condition shows that the short-sellers
were thinly capitalized and thus undercapitalized to acquire the massive securities holdings
purportedly involved in the Solo Trades.  For example, Solo Capital's Elective Professional
File Review Checklists for Metis and Leda state that each entity will meet the EUR 500,000
threshold for Elective Professional status, but also notes that there is not adequate evidence
of their source of funds.[156]  I have also reviewed the balance sheets for Baja Ventures, Nisus
Financial, and Sciron Capital, each of which shows de minimis capital.[157]  By contrast, Baja
purported to execute 78 of the Solo Trades in 2015, including one purported sale of stock
worth DKK 2,295,475,230 (approximately USD $330 million) and Nisus purported to
execute 73 of the Solo Trades in 2015, including one purported sale of stock worth DKK
2,301,496,431 (approximately USD $330 million).

108.    On April 26, 2016, in connection with the liquidation of each of Baja, Sciron, and Nisus,
Murphy wrote that these entities had "NO financials as the Companies were never used, for
trading or any other purpose."[158]

### b.    Stock Loan Counterparties

109.    Similar to the short-sellers, the stock loan counterparties were thinly capitalized entities,
many of which were owned by the same individuals and affiliated with Solo Capital or each
other.  For example:

- Martin Smith, who was employed at Novus Capital Markets (an entity
  purportedly used for broker services in the Solo Trades), was a shareholder and
  director of eight of the stock loan counterparties -- Colbrook Ltd, Equal Services
  Ltd., Diverse Vision Ltd., Neoteric Ltd., Prince Solutions, Ltd., Principle Markets

---

[154] ELYSIUM-00088680.
[155] ELYSIUM-01492240, ELYSIUM-01446776, ELYSIUM-01446773 (A Squared); CAYMAN_00002138-40
(Abra); CAYMAN_00000182-84 (SPK 23).
[156] ELYSIUM-00801486; ELYSIUM-00846141.
[157] BVI_00011771-75, BVI_00011776-80 (Baja); BVI_00011761-65, BVI_00009214 (Nisus); BVI_00011751-55,
BVI_00011756-60 (Sciron).
[158] BVI_00011951.

Ltd., Trance Services, Ltd., and Treehurst Ltd.[159]

- Bhupendra Mistry, who was affiliated with Solo Capital in various respects, including that he was Sanjay Shah's cousin by marriage,[160] was a shareholder and director of four stock loan counterparties—Fintech Consultancy Ltd, Philo Capital Ltd, TechEvolve Ltd, and and Gnosis Capital Ltd.[161]

- Alex Koerner controlled five of the stock loan counterparties—CEKA Invest GmBH, Relative Value Trading, Rock Capital Private Fund Ltd, RVT Consult GmBH, and Tehvah Global Ltd.[162]

110.  I have reviewed financial statements available for several of the stock loan counterparties, which statements show annual income below 390,000 EUR.[163]

111.  In a November 3, 2015 request that certain of the stock loan intermediaries be put into voluntary liquidation, Martin Smith represented that the companies had no assets.[164] Similarly, the Voluntary Liquidator's Report for the stock loan intermediary Neoteric Ltd noted that the entity held $2.00 USD in cash as of November 17, 2015.[165]

112.  The financial statements for Mistry's four stock loan counterparties show annual income ranging from 135,000 to 674,000 (currency not indicated).[166]

### c.  The Forward Counterparties

113.  The forward counterparties followed the same pattern: thinly capitalized entities in the British Virgin Islands and Cayman Islands that were owned by the same people and/or

---

[159] CAYMAN_00002695-97, CAYMAN_00002694 (Colbrook Ltd); BVI_00004921, BVI_00004919-20 (Diverse Vision Ltd); BVI_00005930-31, BVI_00005932 (Equal Services Ltd); CAYMAN_00003022-23, CAYMAN_00003021 (Neoteric Ltd); BVI_00010547-49 (Prince Solutions Ltd); BVI_00010854-56 (Principle Markets Ltd); BVI_00013858-60 (Trance Services Ltd); BVI_00014445-47, BVI_00014576 (Treehurst Ltd).
[160] *See, e.g.*, ELYSIUM-03495808.
[161] BVI_00006204, BVI_00006203 (Fintech); BVI_00010275, BVI_00010274 (Philo Capital); BVI_00013186, BVI_00013185 (Techevolve); BVI_00006917, BVI_00006916 (Gnosis).
[162] ELYSIUM-03790258 (RVT); BVI_00013460-62, BVI_00013463, BVI_00000006 (Tehvah); ELYSIUM-03790513 (Relative Value); ELYSIUM-09387714, ELYSIUM-09085951 (CEKA); ELYSIUM-06209938 (Rock Capital).
[163] *See,* for example, BVI_00010616-22 (387,500 EUR, Prince Solutions); BVI_00014493-99 (387,500 EUR, Treehurst).
[164] BVI_00004769-70 (referencing Diverse Vision, Equal Services, Prince Solutions, Principle Markets, Trance Services, and Treehurst).
[165] CAYMAN_00003024-26.
[166] BVI_00006057 (135,000, FinTech); BVI_00010140 (135,000, Philo); BVI_00012985 (135,000, TechEvolve); BVI_00006660 (674,000, Gnosis).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 34

affiliated with Solo Capital.

114.    For example:

- David Thomas John Griffiths controlled five forward counterparties: Al Msalli Ltd, Darliz Ltd, LDW Consultants Ltd, Rheidol Trading Ltd, and Ystwyth Trading Ltd.[167]

- Guenther Grant-Klar, who worked at Solo Capital,[168] controlled two forward counterparties, Amalthea Enterprises Ltd and Cork Oak Capital Ltd.,[169] and was also associated with two short-sellers: Leda (as director and shareholder) and Metis (as director).

- Rebecca Robson, who was employed as a Fund Advisor at Solo Capital,[170]  was shareholder and director of four forward counterparties: Allitsen Asset Ltd., Connaught Global Ltd., Gartside Global Ltd., and Lyall Capital Ltd.[171]

- Daksha Bhudia, Sanjay Shah's sister,[172] controlled four forward counterparties: DTS Capital Ltd, Sole Capital Ltd, Stratina Holdings Corp. and T&S Capital.[173]

115.    The 2015 financial statements for Robson's four forward counterparties show de minimis capital.[174]

116.    In December 2015, in connection with the voluntary liquidation of these "shell" companies, Robson wrote that the companies had not been active for two months and that they had no assets or liabilities.[175]  She later stated that the only funds the company ever had came from seed capital.[176]

---

[167] BVI_00000757-58 (Al Msalli); BVI_00000759-60 (Darliz); BVI_00016213, BVI_00016215 (LDW); BVI_00011449, BVI_00011419, BVI_00000006 (Rheidol); BVI_00014734-35, BVI_00000006 (Ystwyth).
[168] ELYSIUM-00150387.
[169] ELYSIUM-01300908 (Amalthea); ELYSIUM-07020244 (Cork Oak).
[170] ELYSIUM-08346929 (Solo employee information).
[171] BVI_00001085, BVI_00001084 (Allitsen Asset Ltd); BVI_00004286, BVI_00004285 (Connaught Global Ltd); BVI_00006492, BVI_00006616 (Gartside Global Ltd); BVI_00008972, BVI_00009032 (Lyall Capital Ltd).
[172] *See, e.g.*, ELYSIUM-00067009.
[173] CAYMAN_00003193-95, CAYMAN_00003192 (T&S); BVI_00005310, BVI_00005309 (DTS); BVI_00012258, BVI_00012254 (Sole); BVI_00005226, BVI_00012613 (Stratina).
[174] BVI_00000994 (Allitsen); BVI_00001017 (Connaught); BVI_00001018 (Gartside); BVI_00001019 (Lyall).
[175] BVI_00001003-BVI_00001005 (December 7, 10, 2015 emails).
[176] BVI_00000998-99 (February 1, 2016 emails).

### D.    Glossary of key terms and dates

117.    To walk through the Solo Trades at issue in this litigation, it is useful to identify some of the key dates in the dividend calendar related to when a public company declares and pays a dividend on its equity stock.  These dates are important because they are used to determine which shareholder would be entitled to receive any dividends that might be paid by the company in a real-world transaction.

**Declaration date** – The declaration date is the date that the dividend is announced by the company.  On this day, the company will provide information about the size of the dividend, the date of record and the payment date.[177]

**Record date** – The record date is the date on which VP Securities determines which investors are on the share register and therefore entitled to the dividend payment.  At the close of business on the record date, VP Securities takes a snapshot of who is physically holding the shares (the holders of record).[178]

**Ex-dividend date** – The ex-dividend date refers to the first day that a stock trades without a dividend right.  The ex-date typically occurs up to three days before the record date. Purchasers of shares on or after the ex-dividend date are not entitled to receive a dividend.[179]

**Payment date** – The payment date is the date the dividend is actually paid.[180]

---

[177] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).
[178] Declaration of Anders Peter Bryde Rasmussen, May 17, 2021, at 8; H. Sorensen 9/21/21 Dep. Tr. at 120:3-17, and 12/7/21 Dep. Tr. at 17:10-25.
[179] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).
[180] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 36

E.    **Dividend Withholding Taxes in Denmark**

118.    Under the Danish Withholding Tax Act ("WHTA"), a company that pays dividends is required to withhold a 27 percent dividend tax on behalf of the recipients of the dividend and remit it back to SKAT.[181]

119.    However, there is an exemption available to certain non-Danish shareholders that reside in countries (such as the United States) that have entered into a formal treaty, called a double taxation agreement ("DTA"), with Denmark.[182] This treaty generally entitles United States-based owners of Danish securities to obtain a full or partial refund on the dividend withholding tax paid on their shares since they will be taxed in the United States on their income earned worldwide. Qualifying United States pension plans are eligible for a full refund.

120.    When such an exemption applied, an eligible shareholder could submit a claim for a withholding tax ("WHT") refund. To receive a WHT refund, the shareholder would file a claim by submitting the appropriate forms and supporting documentation to SKAT that proved its eligibility.

121.    For example, if a pension plan located in the United States owned shares in a Denmark-listed company (e.g., Novo Nordisk) on the relevant date, when Novo Nordisk paid a dividend, WHT would be deducted from the dividend by Novo Nordisk and remitted to SKAT. The pension plan would receive only the net dividend (net of the 27% withholding tax) into its brokerage account. Under Denmark's double taxation treaty with the United States, the pension plan could request a refund from Denmark on the entire amount of WHT paid.

122.    Between 2012 and 2015, Denmark was subject to a massive WHT fraud orchestrated by Solo Capital. The fraud, as discussed in greater detail below, involved WHT reclaims worth, in total, approximately DKK 7.2 billion (USD $1.1 billion) that were based on thousands of fictitious stock transactions purportedly executed by a close network of Solo Capital-

---

[181] Danish Withholding Tax Act) § 65.
[182] Convention and Protocol between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., art. 10, ¶ 2, May 6, 1948, S. Treaty Doc. No. 106-12 (effective date Jan. 1, 2001).

affiliated entities.[183]

### F.    Background and discussion on legitimate stock lending transactions

123.    Legitimate securities lending is an over-the-counter market that facilitates the borrowing and lending of securities.  Typically, institutional investors such as pension funds, mutual funds and sometimes even charitable foundations will lend their security portfolios in exchange for cash collateral.[184]  The lender will then invest the cash collateral and derive a return, enabling the lender to increase the yield on their portfolio.[185]  Borrowers are typically hedge funds, options traders and other asset managers who borrow securities often for the purpose of covering short-sale positions, which need to be covered due to regulatory requirements in various jurisdictions.[186]  Both parties to the lending transaction generally rely on intermediaries (*e.g.,* custodians and prime brokers) to facilitate the transaction and manage counterparty risk.[187]

124.    To manage the counterparty risk of the stock loan, the borrower provides the lender with cash collateral that is typically greater than the market value of the borrowed securities.[188]  Therefore, in the event of a default by the borrower, the lender can liquidate the collateral and use the proceeds to repurchase the loaned securities in the open market.  In order to ensure that the lender has sufficient collateral, the borrowed securities are typically marked-to-market on a daily basis.[189]  If the market value of the loaned securities increases throughout the loan term, then the initial collateral provided by the borrower may be insufficient and the borrower will be required to provide additional collateral to the lender, and vice versa.[190]  At the end of the loan, the borrowed security and related collateral are then returned to their respective owners.

---

[183] David Segal, *Where in the World Is Denmark's $2 Billion?*, The New York Times, October 5, 2018.
[184] Viktoria Baklanova, Adam Copeland & Rebecca McCaughrin, *Reference Guide to U.S. Repo and Securities Lending Markets*, Federal Reserve Bank of New York Staff Reports, Revised December 2015, at 21-33.
[185] *Id*.
[186] *Id*.
[187] *Id*.
[188] https://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm (last visited December 23, 2021).
[189] https://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm (last visited December 23, 2021).
[190] Viktoria Baklanova, Adam Copeland & Rebecca McCaughrin, *Reference Guide to U.S. Repo and Securities Lending Markets*, Federal Reserve Bank of New York Staff Reports, Revised December 2015, at 21-33.

125.    A stock loan transaction is structured legally as a simultaneous agreement between two entities to engage in a sale of securities on the stock loan date, with the repurchase of the securities by the initial stock lender at a later date.[191]  The lender of the securities temporarily passes the legal ownership of the loaned security to the borrower for the duration of the loan.[192]  However, the economic benefit of any corporate actions, such as dividend payments, are rebated back to the lender of the security.[193]  The lender regains legal title to the securities at the end of the loan when the securities are returned.

### G.    Background on the use of legitimate forward/future transactions as a hedge

126.    A forward contract represents a commitment to buy or sell an asset (such as a stock) at a specified price (the forward price) and on a specified date (the maturity date). [194]  Forward contracts are traded over-the-counter (not on exchanges).

127.    Forward contracts usually do not require payment until the maturity date.  However, counterparties typically require two-way collateral agreements in which a daily mark-to-market assessment of the position is performed, and any unrealized losses incurred by the purchaser of the forward contract is paid to the other party.  The two-way contract also means that if the seller of the forward is on the losing side of the transaction, it makes collateral payments to the purchaser.[195]

128.    Futures contracts are similar to forward contracts, except that a futures contract is an exchange-traded, standardized contract that is settled daily (not just at maturity), meaning that futures contracts can be transacted at any time.[196]

129.    When investors enter a futures contract, they are required to pay a margin deposit (or a performance bond) as collateral to ensure that both parties can meet their obligations under

---

[191] *Id*.
[192] *Id*.
[193] *Id*.
[194] Futures and Forwards, Corporate Finance Institute,
https://corporatefinanceinstitute.com/resources/knowledge/finance/futures-forwards// (last visited Nov 30, 2021).
[195] Laura E. Kodres, *Hedge Fund Investment Strategies*, Hedge Fund and Financial Market Dynamics, International Monetary Fund, May 15, 1998, at 49.
[196] Futures and Forwards, Corporate Finance Institute,
https://corporatefinanceinstitute.com/resources/knowledge/finance/futures-forwards// (last visited Nov 30, 2021).

the contract.[197]  Margin requirements are set by the exchange on which the futures contract is traded, not by the individual brokerage firms (although some brokerage firms may set higher margin rates than what is stipulated by the exchanges).  Standard margin requirements can range from 5 percent to 20 percent, depending on the specific country and contract being traded, although some contracts may have lower margin requirements.[198]  Therefore, unfavorable price movements could result in a demand to post additional margin funds.  If an investor fails to meet a margin call, its brokerage firm may close out of the futures position or sell other assets held in the account to cover the margin deficiency.

130.    Investors typically use forwards and futures contracts as part of a "hedging strategy" to lock in a purchase or sale price of a stock in advance, thereby removing the uncertainty about any subsequent changes in the market price of the underlying stock and eliminating the risk of any unexpected losses.

## VI.    OPINION NO. 1: THERE IS NO EVIDENCE THAT THE PLANS EVER OWNED ACTUAL SHARES OF DANISH SECURITIES FROM THEIR SOLO TRADES, OR RECEIVED ACTUAL DIVIDENDS ISSUED BY THE DANISH COMPANIES WHOSE STOCK WAS PURPORTEDLY USED IN THE SOLO TRADES

131.    I have reviewed and analyzed the evidence available in this case to determine whether there is any indication that the Plans purchased or owned actual Danish securities or received actual dividends issued by Danish companies.  Among the steps taken, I reviewed (i) representations made by or on behalf of Solo Capital concerning the identity and location of any sub-custodians used by the Solo Custodians to custody Danish securities purportedly owned by the Plans and documents related thereto;[199] (ii) Solo Capital's business records for any indicia of share ownership; (iii) Solo Capital's bank records for any indication of dividend receipt; and (iv) each leg of the Solo Trades to determine whether actual shares

---

[197] https://www.finra.org/investors/learn-to-invest/types-investments/security-futures (last visited December 8, 2021).

[198] https://www.finra.org/investors/learn-to-invest/types-investments/security-futures (last visited December 8, 2021); s*ee also* https://www.theice.com/publicdocs/futures/Futures_Europe_Single_Stock_Futures_KID.PDF (last visited December 13, 2021)

[199] Solo Capital was purportedly the prime custodian for the Solo Trades for the Plans and then supposedly entered arrangements with others to act as sub-custodians.  *See* ELYSIUM-03283228; ELYSIUM-04117677; *see also* discussion *infra* regarding the sub-custodians.

existed. Based on my review and analysis as set out in greater detail below, I have concluded that the Solo Trades did not involve the purchase or ownership of any actual Danish securities, and that the Plans did not receive any actual Danish dividends.

**A.     The sub-custodians identified by Solo Capital confirmed that they did not hold any shares of Danish securities on behalf of the Solo Custodians during the relevant period.**

132.    A custodian in a financial market is an institution (such as a bank) that holds securities, for safekeeping and clearing, on behalf of its customers. The custodian also arranges for the settlement and deliveries of any securities transactions and administers the collection of dividends. Custodian banks are often referred to as global custodians if they maintain assets for their customers in multiple jurisdictions around the world, using their own local branches or other local custodian banks ("sub-custodian") with which they contract to be in their global network in each market to hold securities for their respective customers.

133.    Therefore, any securities that were purchased by the Plans would have ultimately been held by the Solo Custodians or any sub-custodians used by the Solo Custodians. If the Plans had actually held any positions in Danish securities, or received dividend payments from Danish companies, the Solo Custodians, or their sub-custodians, would maintain records of the transactions reflecting that the shares were in fact received and held in custody and that dividends were in fact received.

134.    As far as I am aware, Solo Capital, at various times, has identified three possible financial institutions that acted as sub-custodians for holdings of Danish securities for Solo Capital's clients. In related proceedings in England, Shah claimed that Solo Capital had a sub-custodian arrangement with JPMorgan Chase from August 2012 through October 2013, and a sub-custodian arrangement with Skandinaviska Enskilda Banken AB ("SEB") from July 2013 through April 2014.[200]  Additionally, in response to an inquiry from Solo Capital's regulator in England, the Financial Conduct Authority, Solo Capital's legal counsel Reed Smith, LLP represented in a letter dated March 11, 2016 that the Zurich Branch of Société Générale SA ("Société Générale") was the only sub-custodian used by the Solo Custodians to

---

[200] Sanjay Shah Defendants' Response to Claimant's Request Dated 4 June 2019 for Further Information Under CPR 18, pgs.4-5, 11, 15.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 41

sub-custody Danish securities for the period of January 1, 2014 to August 24, 2015.[201]

135.    I searched the voluminous business records obtained by court order from Solo Capital's records in Dubai and produced in this litigation for additional evidence of any other custodians or sub-custodians for the Danish equities that were supposedly purchased in the Solo Trades and owned by the defendant Plans and was unable to find any such evidence.

136.    I also reviewed the custodial records from Solo Capital's accounts at Société Générale that were obtained through discovery in this litigation and noted that there were no transactions or positions in the purported Danish equities in the Solo Trades that were held on behalf of the Solo Custodians for the Plans.[202]  Furthermore, both JPMorgan Chase and SEB provided sworn affidavits attesting to the fact that they performed an internal review of their own records and found no evidence that they held any of the relevant Danish securities on behalf of the Solo Custodians during the relevant period or had any record of receiving dividends from the Danish companies they were asked to search for.[203]

137.    I am unaware of any credible explanation for the lack of Danish holdings on behalf of the Solo Custodians at the sub-custodians identified by Shah other than that no such shareholdings ever existed.

138.    Based on this evidence, or lack of evidence, alone, I have concluded that the Plans never owned the Danish shares they purported to own from the Solo Trades, nor did they ever receive the dividends from the Danish companies.

### B.    No evidence of legitimate trading was found in Solo Capital's business records

139.    If, as Sanjay Shah contends, the Solo Custodians used sub-custodians to custody the Plans' Danish securities, based on my experience I would expect the business records of the Solo Custodians to contain voluminous documents reflecting the custody of those shares at the sub-custodians.  For example, I would expect to find certain records from third parties unrelated to the Solo Custodians, such as:

---

[201] ELYSIUM-05327063.
[202] *See* SCPADMINISTRATORS_00000096 through SCPADMINISTRATORS_00002911.
[203] Declaration of Matthew J. Totman, December 15, 2021; Declaration of Anders Peter Bryde Rasmussen, May 17, 2021.

- Custodian records evidencing the actual shares being held

- Account statements from the various sub-custodians

- Evidence that the securities were received/delivered

- Receipt of cash from the issuer or a custodian in the custodial chain on or near the dividend payment date

- SWIFT confirmations (which are typically generated when there is an international cash transfer and includes all the details of the transaction including date, amount, currency, sender, and recipient) as evidence of cash collateral being sent/received from the stock loans

- Evidence of additional cash collateral being sent/received related to the mark-to-market daily margin calls on the loans as the stock price fluctuated throughout the loan term

- Email or other communications between Solo Capital and any sub-custodians regarding the massive securities holdings during a four-year period

140.    I would further expect to find internal record keeping, such as ledgers or spreadsheets, tracking the Solo Custodians' securities holdings at each of the sub-custodians.

141.    I understand that through proceedings in England and Dubai, SKAT obtained records, in the form of electronic and hardcopy material, from Elysium Global (Dubai) Limited, an entity within the Shah-controlled universe.[204]  Not surprisingly, given the volume and scope of the Solo Trades, there were more than 10 million records seized in total.  In addition, through the US litigation, SKAT obtained additional records from the Solo Custodians' administrators in England, which included bank statements from financial institutions at which the Solo Custodians held accounts, internal Solo Custodian documents held at an offsite storage facility, and correspondence with counsel for the Solo Custodians' in connection with an investigation by the Financial Conduct Authority.

142.    I have performed an extensive search through the business records of the Solo Custodians.  Among other things, I searched for the type of records described herein.  Based on that review, I have seen no evidence that the Solo Custodians received or custodied any

---

[204] ELYSIUM-05295222.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 43

Danish securities for the Plans, nor any evidence that the Solo Custodians used any sub-custodians to custody any such securities.

143.    Similarly, based on a review of the Solo Custodian's bank records, I have seen no evidence that they received, on behalf of the Plans, actual dividend payments arising from the ownership of Danish shares, either from Danish issuers directly or from other custodian institutions.

144.    By contrast, my review of the Solo Custodians' business records shows that the Solo Custodians kept detailed records of the paper trades described in subsection (c) below, and of the payments made to the various participants of the scheme.

145.    The lack of any third-party evidence or business records reflecting holdings of actual securities and the lack of receipt of actual dividends underscores my conclusion that the Solo Trades did not include any actual Danish securities or dividends.

### C.    The Solo Trades were pre-arranged, inter-dependent, circular, paper transactions in which no actual securities were bought or sold

146.    As part of my analyses, I reviewed records related to all 2,559 of the Solo Trades purportedly orchestrated by Solo Capital on behalf of the Plans.  Based on this review, I concluded that the Solo Trades gave the appearance that the Plans purchased Danish securities, but in fact no actual Danish securities were bought or sold.  Rather, in each case, the Plan purportedly purchased the securities from a short-seller—i.e., a counterparty that did not own any Danish securities at the time of each purported sale.  To "cover" the short in order to be able to deliver the securities to the Plan on the settlement date, the seller purportedly borrowed the shares, but in each case the shares were borrowed in essence from the very Plan that purportedly purchased those shares from the seller.  The seller never had any shares to sell, and the Plan never acquired any shares to lend.  In short, Solo Capital attempted to create shares out of thin air.

147.    In order to generate a paper trail, each of the purported Solo Trades involved a similar closed loop, circular trading pattern, involving (1) ostensibly the purchase of Danish equity securities, (2) the use of purported stock loans to finance the purchases by Plans that otherwise had no money, and (3) purported forward/futures hedging transactions, all related to certain Danish equities structured around their respective dividend payment dates.  After

the dividend payment date, the purported trades were subsequently reversed over several weeks or months to close out the position. The only "profits" earned by the Plans were generated through the receipt of WHT refunds ultimately received from SKAT, net of substantial fees drained from the refund proceeds by Solo Capital and others. There were no material profits generated from the purported trading activity itself. In fact, in each case, the paper transactions were designed to net to zero for the trading counterparties.

148. As discussed further below, each of the Solo Trades are characterized by the same trading pattern. From August 2012 through December 2013, the transactions purportedly executed by the Plans followed what I refer to as a "Simple Trading Loop". Beginning in March 2014, Solo Capital added an additional layer of counterparties and brokers to the circular trading pattern and followed what I refer to as a "Complex Trading Loop" (*see* discussion *supra* regarding simple and complex loop Solo Trades).

149. The parties to each leg of the securities purchases, stock loans, and forward hedges were entities that "on-boarded" with the Solo Custodians, and thus were all "trading" exclusively on the Solo Capital platform. Importantly, none of these thousands of transactions were executed with parties in the open market.

150. Accordingly, it is my conclusion that all 2,559 of the Solo Trades were basically clones of each other; all were closed loop, circular paper transactions with no actual securities traded.[205]

### 1.    Analysis of the Solo Trades purportedly executed by the Plans

151. Upon my request, I was provided a list from Counsel of the 2,559 refund claims submitted to SKAT by the Defendants from August 2012 to April 2014. Each refund claim filed by the Defendants was linked to a unique series of transactions which resulted in the purported receipt of a dividend by the Plans. This is what I have defined as the Solo Trades. For each refund claim for each security purportedly owned by each Plan, I searched for and

---

[205] I used the term clones to describe the basic structure in all the Simple Loop Solo Trades and basic structure in all the Complex Loop Solo Trades being virtually identical in form, with varying use of different Danish equities, forwards and futures and stock loan terms and pricing. The fact that the Solo Trades used different equities at times, different stock loan pricing, different forward pricing, etc, does not undercut that they were all clones of one another that were all pre-designed and executed on paper to obtain false tax refunds from SKAT.

analyzed the trading records created and maintained by Solo Capital for each leg of the trading loops.

152.    The Simple Trading Loops were used from August 2012 through December 2013, with the first purported trades occurring on August 8, 2012.[206]  From August 8, 2012 through December 26, 2013, Solo Capital orchestrated 319 Simple Trading Loops for 42 Plans, which resulted in 319 dividend refund claims being filed with SKAT.

153.    For each of the 319 Simple Trading Loops, the trade confirmations generated by Solo Capital, or a similar document, to create the documentation for the complete list of the Simple Trading Loops were reviewed and analyzed.  This included documents relating to the individual transactions needed to complete each of the 12 steps for the 319 Simple Trading Loops.  These documents include the following datapoints for each of the 12 transactions that comprised the Simple Trading Loops:

- The name of the broker or counterparty
- Trade Date
- Settlement Date
- Price
- Quantity

154.    Beginning in March 2014, Solo Capital added additional layers to the trading loops resulting in an 18-step Complex Trading Loop.  The Complex Trading Loops followed a similar methodology to the Simple Trading Loops but purportedly funneled each type of trade through two intermediary brokers instead of one.  This new step has no apparent business purpose other than to provide an additional layer of complexity to the extent any regulator inquired about the Solo Trades.  From March 4, 2014 through May 11, 2015, Solo Capital orchestrated 2,240 Complex Trading Loops for 166 Plans which resulted in 2,240 dividend refund claims begin filed with SKAT.

155.    Utilizing the same methodology as the Simple Trading Loops, the trade confirmations generated by Solo Capital, or a similar document, for the complete list of the 2,240 Complex Trading Loops, which included documents relating to the individual transactions needed to complete each of the 18 steps for the 2,240 Complex Trading Loops were reviewed and

---

[206] For example, see ELYSIUM-00604753; ELYSIUM-00604951; ELYSIUM-06094123; ELYSIUM-00604746.

**CONFIDENTIAL**
**Expert Report of Bruce G. Dubinsky**
**December 31, 2021**
**Page 46**

analyzed.  These documents contained the same datapoints for each of 18 transactions that comprised the Complex Trading Loops:

- The name of the broker or counterparty
- Trade Date
- Settlement Date
- Price
- Quantity

156.    The datapoints collected for each transaction were used to map out each Simple Trading Loop and Complex Trading Loop that took place from August 8, 2012 to May 11, 2015. Exhibit 3 displays the data collected for the transactions related to the Bellwether Plans.

157.    This analysis allowed me to determine if all the transactions comprising both the Simple Trading and Complex Trading Loops were essential replicas of each other, and whether any of the Solo Trades involved the purchase of actual securities by the Plans.  After conducting the review and analysis, I concluded that the transactions were in fact essentially replicas of each other, and that none of the Solo Trades involved the purchase of actual securities by the Plans.

### 2.    Sample "Simple loop" transaction purportedly executed by the Bernina Plan

158.    On March 21, 2013, the Bernina Plan purportedly purchased 600,000 shares of Carlsberg A/S – B ("Carlsberg") stock from an entity called D.D.C. Cayman.  Upon review of the supporting documentation underlying this transaction and a search of Solo Capital's records, there is no evidence that D.D.C. Cayman owned any shares in Carlsberg at the time of the sale.  Thus, at the time of the sale, D.D.C. Cayman was a short-seller, and would have to acquire the shares to cover the short in time for delivery to the Bernina Plan on the settlement

date.[207]  D.D.C. Cayman, however, did not obtain any shares from the market to cover the short.  Rather, as demonstrated below, D.D.C. Cayman purportedly borrowed the shares from the Bernina Plan itself (through a two-step lending transaction).  The Bernina Plan also did not have any Carlsberg shares to lend, making this a completely circular and fabricated securities transaction.  Below I set out each leg of the circular loop.



**Figure 8 – No evidence that any shares of Carlsberg stock entered the trading loop**

  a.  **Trade Approval 1: FGC Securities LLC purportedly purchased shares in Carlsberg from D.D.C. Cayman in March 2013**

159. On March 21, 2013, FGC Securities LLC, acting as broker, purportedly purchased 600,000 shares of Carlsberg at a price of DKK 586.3316 per share from D.D.C. Cayman for

---

[207] While it is possible for an investor to sell shares that the investor does not yet own (referred to as a "short sale"), the investor must acquire the shares (referred to as "covering the short") before the delivery date of those shares. Short sales executed without having previously acquired the right to obtain the shares before the delivery date is referred to as a "naked short" or "uncovered short."  In the EU, the *EU Short Selling Regulation* which came into effect in November 2012 prohibits uncovered short selling of listed shares in Europe, other than by market makers or banks involved in the issuance of government bonds.  *See*, https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/30-what-is-short-selling-and-what-is-the-role-of-repo/ (last visited December 9, 2021); *see also*, Regulation (EU) No 236/2012 of the European Parliament and of the Council of 14 March 2012 on short selling and certain aspects of credit default swaps, Official Journal of the European Union, March 24, 2012.